IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

SAMUEL BARROW,

        Plaintiff,   :   Case No. 3:15-cv-341

           District Judge Walter Herbert Rice
- vs -   Magistrate Judge Michael R. Merz

LIVING WORD CHURCH, et al.,

        Defendants.   :

## REPORT AND RECOMMENDATION ON CASHLAND DEFENDANTS' MOTION TO DISMISS

This case is before the Court on Motion of Defendants Cashland Financial Services, Inc.; Cash America International, Inc.; and Jack Daugherty (the "Cashland Defendants") to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim against them on which relief can be granted (ECF No. 27). Plaintiff opposes the Motion (Memo. in Opp. ECF No. 44) and the Cashland Defendants have filed a Reply in Support (ECF No. 47).

A motion to dismiss involuntarily under Fed. R. Civ. P. 12(b)(6) is a dispositive motion on which an assigned Magistrate Judge must file a recommended disposition. 28 U.S.C. § 636(b).

1

The Cashland Defendants read the Amended Complaint[1] as alleging against them only two claims: (1) invasion of privacy by condoning a lynching pool based on what would happen to Mr. Barrow in the event the tape[2] of him allegedly stolen from him by Defendant Nartker were to be released to the public and (2) intentional infliction of emotional distress arising from the same conduct. Plaintiff confirms that reading (Memo. In Opp., ECF No. 44, PageID 296).

"The purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; it is not a procedure for resolving a contest about the facts or merits of the case." Wright & Miller, FEDERAL PRACTICE AND PROCEDURE: Civil 2d §1356 at 294 (1990); *see also Gex v. Toys "R" Us*, 2007 U.S. Dist. LEXIS 73495, *3-5 (S.D. Ohio, Oct. 2, 2007); *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993), *citing Nishiyama v. Dickson County, Tennessee*, 814 F.2d 277, 279 (6th Cir. 1987). Stated differently, a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is designed to test the sufficiency of the complaint. *Riverview Health Institute LLC v. Medical Mutual of Ohio,* 601 F.3d 505, 512 (6th Cir. 2010).

For fifty years the Supreme Court's test for dismissal under Fed. R. Civ. P. 12(b)(6) was embodied in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." However, in 2007, the Court expressly overruled Conley, holding

> Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004)("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right

---

[1] The Court has allowed Plaintiff to file a Second Amended Complaint which does not different from the Amended Complaint in any material respect as it relates to these Defendants.
[2] Although the word "tape" is used in the pleadings, given the context the Court reads this to refer to a digital video recording whose format has not yet been revealed to the Court.

2

> of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), *see, e.g., Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

*Bell Atlantic Corp. v. Twombly*, 550 U.S.544, 555 (2007).  The Court continued that this new standard should be applied early in federal litigation:

> [W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, "'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.'" 5 Wright & Miller § 1216, at 233-234 (quoting *Daves v. Hawaiian Dredging Co.*, 114 F. Supp. 643, 645 (D. Hawaii 1953) ); see also *Dura [Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)], at 346, 125 S.Ct. 1627, 161 L. Ed. 2d 577; *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc* ., 289 F. Supp. 2d 986, 995 (N.D.Ill.2003) (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase").

*Id.*   at 558.

The Court continued "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), *citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)(on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation.")

Two years later the Court further explicated the new rule:

3

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Twombly*], at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ibid. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.,* at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (brackets omitted).

Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.,* at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not "show[n]" -- "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint,

4

> they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Shortly after *Iqbal*, the Sixth Circuit held that under *Iqbal*, a civil complaint will only survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. ... Exactly how implausible is "implausible" remains to be seen, as such a malleable standard will have to be worked out in practice." *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629-630 (6th Cir. 2009).

In light of *Twombly* and *Iqbal*, bare assertions of legal conclusions are not sufficient. *Rondigo L.L.C. v. Twp. of Richmond,* 641 F.3d 673, 684 (6th Cir. 2011); *Hensley Mfg. v. ProPride, Inc.,* 579 F.3d 603 (6th Cir. 2009); *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996); *Sogevalor S.A. v. Penn Central Corp.*, 771 F. Supp. 890, 893 (S.D. Ohio 1991).

The allegations of the Second Amended Complaint need to be measured against these legal standards.

> ¶ 48 reads
>
> > In February 2014, Ms. Nartker, during the course and scope of her employment with ABF, and Ms. Moore, during the course and scope of her employment at Cashland, started company betting pools to "lynch" Mr. Barrow, referring to him as "Just Another N."

This is the first mention of any connection between Ms. Moore and Cashland, although Cashland is described in § 5 as an "Ohio payday loans company with its principal place of business in Ohio." ¶ 48 alleges Ms. Moore started a company betting pool in the course and

5

scope of her employment about what would happen to Plaintiff when stolen "explicit tape" was released. The Second Amended Complaint says nothing about what Ms. Moore's job is with Cashland or how it could possibly be within the scope of that job to create "company betting pools." To impute liability to Cashland for the betting pool, something more about Ms. Moore's scope of employment needs to be pled.

To give a contrasting example, betting pools on the results of the NCAA basketball championship playoffs in March of each year are a common feature of American life. Just within the federal judiciary, such betting pools among judiciary employees are sufficiently common as to degrade Internet services during March. Such pools could easily be among employees of one company without being "company" betting pools in the sense of being sponsored by the company or even being within the scope of employment of any particular employee to create. In this context, the allegation that Ms. Moore created the betting pool in the course and scope of her employment is a mere pleading of a legal conclusion without enough factual context to make the claim plausible.

¶ 50 alleges "[t]he lynching pool was widely distributed within Cashland and ABF including to high-level employees." This allegation is in the passive voice; it does not allege action by Ms. Moore or anyone else at Cashland to make the distribution. Nor does it say what the purpose of the distribution was. For example, is it alleged that Ms. Moore widely distributed the pool to invite people to participate? Cashland is a large operation with many locations.[3] Is it plausible that clerks in a Cashland store in Canton, Ohio, or Evansville, Indiana, would want to participate in a pool about Mr. Barrow? Were the high-level employees at Cashland invited to participate in the pool by Ms. Moore?

---

[3] Cashland is sufficiently ubiquitous in the Dayton, Ohio, area that its being a "large operation" is subject to judicial notice.

¶ 51 alleges "Mr. Barrow complained about Ms. Nartker and Ms. Moore's actions to high-level employees at both Cash America and ABF via letter and email." (ECF No. 26-1, PageID 170). Cash America International is identified in ¶ 4 as a "Texas payday loans company," but no connection is alleged between Cash America and Cashland. Who are the "high-level employees" at Cash America to whom Barrow complained? Why did he complain to Cash America high-level employees instead of to high-level Cashland employees?

¶ 52 alleges Mr. Feehan, identified as President and CEO of Cash America, "stated that Mr. Barrow's letter complaining of the situation had 'upset a lot of people" and that what Mr. Barrow was going through was 'karma.'" This paragraph appears to make completely irrelevant allegations. Mr. Feehan is not named as a defendant, although Barrow did name him as a defendant in a prior filing of these claims in the Montgomery County Common Pleas Court (*Barrow v. Nartker*, Case No. 2015 CV 475, copy at ECF No. 49-1, PageID 341, et seq.) Both of the statements alleged to have been made by Feehan are innocuous.

¶ 53 alleges Mr. Daugherty, who is named as a Defendant, "stated that he did not care what happened to Mr. Barrow but did not need Al Sharpton (described with a racial epithet) involved such that Cash America's ability to issue payday loans to minorities would be impacted." Again, no allegation is made about any connection between Cash America and Cashland. Nor does the pleading say to whom these statements were made. The audience for the statements is material because this is a case for intentional infliction of emotional distress. Without deciding whether either would be actionable, a racial epithet uttered to a third-party in private which happens to have been reported to Mr. Barrow is far less likely to be actionable than a racial epithet hurled at Mr. Barrow personally.

It also matters what the racial epithet spoken of Reverend Sharpton was. There are, unfortunately, many derogatory racial epithets in the American vocabulary, which vary greatly in the degree of derision displayed by their use. For example, using the word "boy" of an African-American adult male is derisive and should not be done. But one can readily imagine a white man seeing a black male companion stumble, fall, and hit his head exclaiming "Oh boy, are you all right?" with no derisive intent, although the person who fell might well hear the comment as derisive.

What is more, the degree of contempt conveyed by the use of various racially-charged labels has changed over time. When W.E.B. Du Bois founded the National Association for the Advancement of Colored People in 1909, he surely did not intend the use of the word "colored" as derisive and the organization retains that name, although "colored" has become a derisive racial term. Because the degree of contempt intended and therefore the degree of offense taken differs markedly from epithet to epithet, the actual term allegedly used is material. No one can doubt that in contemporary America, "nigger" is more offensive than "colored."[4] Plaintiff should have pled the actual racial epithet used by Mr. Daugherty because it is material.

The gravamen of Plaintiff's claims against the Cashland Defendants appears to be that they "condoned" the lynching pool. See ¶ 74(g) and argument at Memo. In Opp. ECF No. 44, PageID 299 which characterizes the complaint as about "a corporation condoning a company 'lynching pool.'" Later in the same Memorandum, Barrow equates what the Cashland Defendants did with a ratification of Ms. Moore's pool (ECF No. 44 at PageID 301 & 302.) "Ratification" implies an action intentionally taken on the part of the ratifier. See Garner, Black's Law Dictionary Tenth at 1452. To condone, on the other hand, can be understood

---

[4] Plaintiff cannot plausibly claim that merely uttering or writing the word "nigger" is actionable regardless of context as he himself has used the word hundreds of times in his book.

8

completely passively – you knew about this evil or wrong in the world and did nothing to stop it. Condonation has no fixed or clear legal meaning except perhaps in the law of adultery. *Id.* at 358.

In opposing the Motion, Plaintiff notes that the detail the Cashland Defendants seek can be obtained in discovery. If the Magistrate Judge understands *Twombly* and *Iqbal* correctly, their import is that the pleadings should frame the issues for discovery by pleading facts, not merely legal conclusions. Discovery at least as to the Living Word Defendants has been stayed pending resolution of their Motion to Dismiss. The Magistrate Judge has recently filed a Report on that Motion. Once that Report is adopted or any objections resolved, the Magistrate Judge intends to participate actively in discovery management in this case. But before that happens, the discovery should be framed by a more factual pleading.

Accordingly, the Magistrate Judge respectfully recommends the Cashland Defendants' Motion to Dismiss be GRANTED unless Plaintiff files an amended complaint curing the pleading deficiencies outlined above not later than May 19, 2016.

May 5, 2016.

s/ *Michael R. Merz*<br>United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).