# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

SAMUEL BARROW,

                Plaintiff,    :    Case No. 3:15-cv-341

                                                        District Judge Walter Herbert Rice
-  vs  -                                 Magistrate Judge Michael R. Merz

LIVING WORD CHURCH, et al.,

                Defendants.    :

## REPORT AND RECOMMENDATIONS

This case is before the Court on Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) of Defendants' Cashland Financial Services, Inc.; Cash America International, Inc.; and Jack Daugherty (collectively the "Cashland Defendants")(ECF No. 70).  Plaintiff opposes the Motion (ECF No. 82) and the time for the Cashland Defendants to file a reply in support has expired. Thus the Motion is ripe for decision.

Because the Motion is dispositive within the meaning of 28 U.S.C. § 636(b), an assigned Magistrate Judge is to file a report and recommended disposition.

1

**STANDARD FOR MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

The test for dismissal under Fed. R. Civ. P. 12(b)(6) has been restated by the Supreme Court:

> Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004)("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), *see, e.g., Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

*Bell Atlantic Corp. v. Twombly*, 550 U.S.544, 555 (2007).

> [W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, "'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.'" 5 Wright & Miller § 1216, at 233-234 (quoting *Daves v. Hawaiian Dredging Co.*, 114 F. Supp. 643, 645 (D. Hawaii 1953) ); see also *Dura [Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)], at 346, 125 S.Ct. 1627, 161 L. Ed. 2d 577; *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc* ., 289 F. Supp. 2d 986, 995 (N.D.Ill.2003) (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase").

*Twombly*, 550 U.S. at 558 (*overruling Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), and specifically disapproving of the proposition from *Conley* that "a complaint should not be

dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); *see also Association of Cleveland Fire Fighters v. City of Cleveland, Ohio,* 502 F.3d 545 (6th Cir. 2007). In *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the Supreme Court made it clear that *Twombly* applies in all areas of federal law and not just in the antitrust context in which it was announced.

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), *citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)(on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation.")

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Twombly*], at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.,* at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (brackets omitted).
>
> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation"

3

(internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.,* at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not "show[n]" -- "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008), *citing League of United Latin Am. Citizens. v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007)(stating allegations in a complaint "must do more than create speculative or suspicion of a legally cognizable cause of action; they must show entitlement to relief"); *see further Delay v. Rosenthal Collins Group, LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009), *Tam Travel, Inc. v. Delta Airlines, Inc. (In re Travel Agent Comm'n Antitrust Litig.)*, 583 F.3d 896, 903 (6th Cir. 2009), *New Albany Tractor v. Louisville Tractor*, 650 F.3d 1046 (6th Cir. 2011).

## Analysis

The only claims made against the Cashland Defendants arise under Ohio law and are within this Court's supplemental jurisdiction under 28 U.S.C. § 1367 (See Second Amended Complaint, ECF No. 63, ¶ 1, PageID 467).  A federal court exercising supplemental or diversity subject matter jurisdiction over state law claims must apply state substantive law to those claims. 28 U.S.C. § 1652; *Gasperini v. Center for Humanities, Inc.*, 528 U.S. 415, 427, n. 7 (1996); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).  In applying state law, the Sixth Circuit follows the law of the State as announced by that State's supreme court. *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008);  *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 758 (6th Cir. 1992);  *Miles v. Kohli & Kaliher Assocs.,* 917 F.2d 235, 241 (6th Cir. 1990). "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Id.;*  *In re Akron-Cleveland Auto Rental, Inc.,* 921 F.2d 659, 662 (6th Cir. 1990); *Bailey v. V & O Press Co.*, 770 F.2d 601 (6th  Cir. 1985); *Angelotta v. American Broadcasting Corp.,* 820 F.2d 806 (1987).

The pleading at issue on the instant Motion is Plaintiff's Second Amended Complaint (ECF No. 70).  This pleading was filed in response to the Magistrate Judge's recommendation that the prior amended complaint be dismissed unless certain identified pleading deficiencies were cured.  Plaintiff asserts the following allegations made in the Second Amended Complaint act to cure those deficiencies:

> 49. In February 2014, Ms. Nartker, during the course and scope of her employment with ABF, and Ms. Moore, during the course and scope of her employment at Cashland, started company betting pools regarding Mr. Barrow, referring to him as "Just Another N." Specifically, Mr. Barrow states as follows:

5

a. Ms. Nartker was a clerk for ABF whose duties included handling freight bills and coordinating with shippers at ABF's business located at 8051 Center Pt. Blvd., Dayton, Ohio 45424.

b. Ms. Moore was a clerk for Cashland whose duties included coordinating payday loans with customers at Cashland's business located at 4977 N. Main Street, Dayton, Ohio 45415.

c. Cashland is a subsidiary of Cash America. The companies engage in the same line of business, and at times, have had overlapping directors.

d. During business hours and at in their respective places of business, Ms. Nartker, with ABF, and Ms. Moore with Cashland and/or Cash America, distributed the betting pool and acted as the facilitators of the betting pool for employees of the companies and circulated the betting pool in hard copy and via email to other employees as further discussed below.

50. The betting pool itself regarded what would happen upon the release of the sex video by Ms. Nartker and Ms. Moore that was stolen from Mr. Barrow. The itemized point system was as follows:

| | |
|---|---|
| A. Suicide | 50 points |
| B. Destitute and Homeless | 15 points |
| C. Alcoholic/drug addict | 15 points |
| D. Gay (from pictures appearing on gay porn site) | 10 points |
| E. Destroy Reputation | 5 points |

A copy of the betting pool from which this is copied is attached as Exhibit B.

51. Tim Magato, the branch manager at the ABF location where Ms. Nartker worked in Dayton, and Richard Nartker, Ms. Nartker's brother and a trucker for ABF in Dayton, also distributed the pool within ABF. Mr. Nartker was the "winner" of the betting pool after it was clear that Mr. Barrow's career life was destroyed.

6

52. Ms. Angela Allen, Ms. Moore's supervisor at Cashland in Dayton, Ohio, assisted Ms. Moore with the distribution of the betting pool to Cashland employees.

53. The initial circulation of the betting pool occurred at the local and regional level of Cashland and ABF in Ohio, with employees participating in the pool. With respect to Cashland and Cash America, this included predominantly loan clerk employees and upper management discussed below. With respect to ABF, the employees included predominantly shipping clerks and truckers, but the pool eventually made its way to participants in ABF's headquarters in Fort Smith, Arkansas.

54. Mr. Barrow later learned of the betting pool through mutual acquaintances of Ms. Nartker and Ms. Moore.

55. Mr. Barrow then complained via email, letters sent via U.S. mail, and oral communications regarding the betting pool to the following management at Cashland and/or Cash America: Jack Daugherty, Founder and Chairmain [sic] of the Board of Cash America, located in Fort Worth Texas, Daniel Feehan, Executive Chairman of the Board of Cash America, located in Fort Worth, Texas, Angie Allen, Ms. Moore's direct and regional supervisor with Cashland, located in Dayton, Ohio, and Brad Shipp in public relations with Cash America, located in Forth [sic] Worth, Texas.

56. Mr. Barrow complained via email, letters sent via U.S. mail, and oral communications regarding the betting pool to Roy Slagel, President of ABF, located in Fort Smith, Arkansas, David Evans, Vice President and Chairman of ABF, located in Forth [sic] Smith, Arkansas, and Judy McReynolds, Chairman, located in Fort Smith Arkansas, as well as to Tim Magato, Director of Operations in Dayton, Ohio.

57. Nobody at Cashland, Cash America, or ABF made any effort to stop the betting pool, despite Mr. Barrow's complaints. Instead, at least Mr. Daugherty, Mr. Feehan, Mr. Magato, and Ms. McReynolds found the betting pool humorous, concluded that it promoted camaraderie among employees, and intentionally allowed the betting pool to continue within their respective

> companies. Cashland and/or Cash America also sent Mr. Barrow a letter refusing to address the concerns Mr. Barrow had raised. ABF never responded in writing to Mr. Barrow's inquiries.
>
> 58. Mr. Daugherty, Founder and Chairman of the Board of Cash America, stated on a phone call with Ms. Moore that Mr. Barrow later learned about through others that he did not care what happened to Mr. Barrow but did not need "that nigger" Al Sharpton involved should the matter escalate such that Cash America's ability to issue payday loans to minorities might be impacted.
>
> 59. By virtue of the widespread distribution of the betting pool, the fact that the betting pool was distributed during business hours to other employees, the participation and support the betting pool garnered locally and regionally within Cashland, Cash America, and ABF, and their refusal at a management level to do anything about the betting pool following complaints while at the same time viewing it as humorous or beneficial, Cashland, Cash America, and ABF ratified the racially-motivated betting pool such that they are responsible for the actions and consequences of their employees.

(Quoted at ECF No. 82, PageID 625-28.)

The parties agree that the claims purported to be stated against the Cashland Defendants are for wrongful intrusion invasion of privacy and intentional infliction of emotional distress.

**Invasion of Privacy by Wrongful Intrusion**

As noted above, *Erie Railroad* requires us to employ Ohio law in evaluating the claims made in the Second Amended Complaint.  The Cashland Defendants assert the elements of the tort of invasion of privacy by wrongful intrusion are set out in *Haller v. Phillips,* 69 Ohio App. 3d 574 (10th Dist. 1990).  That court in turn cites ¶ 2 of the syllabus in *Housh v. Peth,* 165 Ohio St. 35 (1956), as follows:

8

> The Ohio Supreme Court first recognized an actionable right of privacy in *Housh v. Peth* (1956), 165 Ohio St. 35, 59 O.O. 60, 133 N.E.2d 340. Paragraph two of the syllabus in *Housh* provides:
>
> "An actionable invasion of the right of privacy is the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities."
>
> Subsequent opinions of the Supreme Court have adopted the reasoning of the Restatement of Torts. See *Sustin v. Fee* (1982), 69 Ohio St.2d 143, 23 O.O.3d 182, 431 N.E.2d 992. The Restatement of the Law 2d, Torts (1977) 376, Section 652A provides four theories of liability based upon an intrusion of one's right of privacy. Liability may be predicated on an unreasonable intrusion upon the other's right to seclusion, misappropriation of another's name or likeness, unreasonable publicity given to another's private affairs, or liability under a false light theory. The present action represents an attempt to impose liability based upon the first predicate, an unreasonable intrusion.
>
> Section 652B of the Restatement applies to this cause of action and states that:
>
> "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."
>
> The Supreme Court echoed this reasoning in *Housh, supra*, when it wrote that "* * * the wrongful intrusion into one's private activities * * * [must be] * * * in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Id.* at paragraph two of the syllabus.

*Id.* at 577-78.

The Second Amended Complaint does not allege acts on the part of the Cashland Defendants which actively intruded on Mr. Barrow's privacy.  Even as to Ms. Moore, the now-dismissed originating tortfeasor, the pleading does not allege she intruded on Mr. Barrow's privacy with the betting pool.  Rather ¶ 54 alleges "Mr. Barrow later learned of the betting pool through mutual acquaintances of Ms. Nartker and Ms. Moore."  In other words, someone unnamed in the pleadings told Mr. Barrow what was going on.  There is no allegation that person was somehow acting as an agent of Ms. Moore and reporting her behavior to Mr. Barrow in order to intrude on his privacy.

Furthermore, the allegation that the betting pool was started by Nartker and Moore in the course of their employment is purely conclusory.  See ¶ 49.  The business of the Cashland Defendants as alleged in the Second Amended Complaint is making payday loans to consumers. Nothing in the Second Amended Complaint alleges the companies are regularly engaged in running any sort of gambling business.  Not everything an employed person does during business hours and on the employer's property is done in the course and scope of employment.  For example, betting on the NCAA basketball finals is well known to occur in federal courthouses, to the point that streaming of those games has been known at times to degrade network services whose used is supposed to be limited to court work.   Yet no law clerk or courtroom deputy or indeed federal judge has "basketball watching or betting" as part of their job description and it certainly does not advance the work of the courts.

Both parties recognize that intentional torts by employees are outside the scope of employment and therefore not imputable to the employer in the absence of ratification. (Motion, ECF No. 70, and Memo in Opp., ECF No. 82, both citing *Amato v. Heinika Ltd.,* Case No. 84479, 2005-Ohio-189, 2005 Ohio App. LEXIS 206 (8th Dist. Jan. 20, 2005).  To show that he

has pleaded facts sufficient to show ratification, Plaintiff relies further on *Fulwiler v. Schneider,* 104 Ohio App. 3d 398 (1st Dist. 1995). In that case a bouncer for a bar assaulted and seriously injured a patron in the course of escorting him out of the bar at closing and refusing to authorize a free cab ride. The bar owner was sued on a ratification theory. The court of appeals found the following evidence of ratification sufficient for submission to the jury:

> [I]n this case appellee's evidence, if believed, showed not only that appellants continued to employ Gardner, but that (1) Caddy's employees allowed Gardner back into the bar through the locked front door after the assault; (2) they attempted to sneak Gardner out of the back door into a truck while wearing a red Caddy's jacket; (3) they would not allow a police officer to enter the building immediately after the incident; (3) neither Gardner nor any other employee was ever suspended or disciplined in any way for the assault; and (4) Gardner continued to work in the same capacity as a bouncer after this incident. Therefore, there was evidence from which reasonable minds could conclude that appellants ratified Gardner's action and an instruction on ratification was justified.

*Id*. at 407. That is to say, Gardner had committed the criminal offense of felonious assault and his fellow employees tried to protect him from the consequences of his crime with the police. Despite the fact that Gardner was regularly employed as a bouncer and his acts in part furthered the business of the bar owner by enforcing his policy about free cab rides and removing people from the bar when it closed, he was not scheduled to work that night and the jury found he was acting outside the scope of his employment. *Id.* at 404. The court of appeals agreed that continued employment of Gardner as a bouncer was not alone sufficient for ratification.

In this case Daugherty was advised by Barrow of racist conduct by a Cashland employee, Ms. Moore (and perhaps of behavior by Moore's supervisor that abetted Moore). Allegedly he found "the betting pool humorous, concluded that it promoted camaraderie among employees,

11

and intentionally allowed the betting pool to continue." (Second Amended Complaint at ¶ 49). Absent an admission by Daugherty, the first two of these are Plaintiff's conclusions about Daugherty's state of mind. Assuming the truth of those allegations, the law does not hold people liable for having bad thoughts. The third is an omission to act, i.e., a failure to discipline employees for engaging in offensive racist conduct. If Barrow were a fellow employee of Moore at Cashland, he might have a good claim against Cashland under Title VII for maintaining a racially hostile workplace, but that is not what is involved here.

**Intentional Infliction of Emotional Distress**

In recognizing the tort of intentional infliction of emotional distress in Ohio, the Ohio Supreme Court adopted Restatement of the Law 2d, Torts 2d, § 46, and comment "d" to that section which reads:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the

12

> law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.  See Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harvard Law Review 1033, 1053 (1936).

*Yeager v. Local Union 20,* 6 Ohio St. 3d 369, 374-75 (1983)abrogated on other grounds by *Welling v. Weinfeld*, 113 Ohio St. 3d 464 (2007).

In order to recover on an action for the intentional infliction of serious emotional distress four elements must be proved:  1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;  2) that the actor's conduct was so extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered utterly intolerable in a civilized community;  3) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and 4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person can be expected to endure it.  *Miller v. Currie*, 50 F.3d 373 (6th Cir. 1995); *Pyle v. Pyle,* 11 Ohio App. 3d 31, 34 (Cuyahoga Cty. 1983) (citation omitted); *Bellios v. Victor Balata Belting Co.*, 724 F. Supp. 514, 520 (S.D. Ohio 1989).

> Ohio courts have found far more egregious statements than those made by Abrams to fall below the "outrageous" threshold. See, e.g., *Curry v. Village of Blanchester*, 2010 Ohio 3368, ¶¶ 54-55 (Ohio Ct. App. 2010) (where the supervisor told the plaintiff, in front of her colleagues, that she was "all tits and no brain"); *Lombardo v. Mahoney*, 2009 Ohio 5826, ¶ ¶10-11 (Ohio Ct. App. 2009) (where the supervisor called the plaintiff a "cock sucking mother fucker").

*Colston v. Cleveland Pub. Library*, 2013 U.S. App. LEXIS 7690, 19-20 (6th Cir. 2013).

13

Here as with the invasion of privacy claim, there is no allegation that any of the Cashland Defendants did anything to insult Mr. Barrow or inflict emotional damage on him by bringing the betting pool to his attention. Rather the Second Amended Complaint alleges the betting pool actually existed and someone who is not named brought it to Mr. Barrow's attention. Likewise, even assuming for the sake of argument that calling Al Sharpton a "nigger" might be tortious if Mr. Daugherty had done it directly to Mr. Barrow, that is not what is alleged. Rather it is alleged the offensive epithet was spoken in a telephone conversation between Mr. Daugherty and Ms. Moore, a conversation to which Mr. Barrow was not a party.

For the reasons given above with respect to the invasion of privacy tort, there is also no respondeat superior liability on the intentional infliction of emotional distress claims.

**Conclusion**

Judged under the *Iqbal/Twombly* standard, the Second Amended Complaint does not state a claim for relief against the Cashland Defendants. It is therefore respectfully recommended that the Second Amended Complaint be dismissed as to those Defendants with prejudice. The dismissal should be with prejudice because Plaintiff has been given ample opportunity to amend to properly assert any viable claims.

August 3, 2016.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

14

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).